The FUND FOR ANIMALS, Humane Society for the United States, Defenders of Wildlife, Animal Rights Foundation of Florida, Donald Feare, Gustav W. Verderber, Julie Baker, Kristi Gholson, Collette Adkins Giese, Marian Probst Plaintiffs,

v.

Gale NORTON, Secretary, U.S. Department of Interior, Steven Williams, Director, Fish and Wildlife Service, Anne Veneman, Secretary, U.S. Department of Agriculture, Bobby Accord, Administrator, Animal and Plant Health Inspection Service, Defendants.

No. 04 Civ. 959(PKC).

United States District Court,
S.D. New York.

March 28, 2005.

Howard M. Crystal, Meyer & Glitzenstein, Washington, DC, Leonard D. Egert, New York City, for Plaintiffs.

Sarah Sheive Normand, U.S. Attorney's Office, SDNY, New York City, for Defendants.

## MEMORANDUM AND ORDER

CASTEL, District Judge.

The double-crested cormorant (*Phalacrocorax auritus*) is a water bird native to North America. It is a fish-eating bird with a hooked bill, turquoise eyes, a long tail, dark brown in color with two white crests of feathers that appear on its head during breeding season.

This lawsuit arises over federal efforts to manage the nation's population of double-crested cormorants. According to the administrative record, the species has been responsible for the loss of at least $25 million in annual catfish production, largely in the Mississippi Delta. The plaintiffs challenge two rules that they assert were adopted in violation of treaty obligations and a battery of federal statutes. They seek declaratory and injunctive relief.

Both sides have moved for summary judgment. For the reasons explained below, the plaintiffs' motion is denied, and the defendants' motion is granted.

*Background*

According to the United States Fish and Wildlife Service (the "Agency," "Fish and Wildlife Service" or "FWS"), the double-crested cormorant is one of 38 cormorant species worldwide, and one of six found in North America. (FWS at 3161)[1] Double-crested cormorants often live in flocks, and are sometimes confused with geese or loons. (FWS at 3161) Prior to 1970, the cormorant population was jeopardized by DDT and other organochlorine contaminants. (Pl. 56.1 ¶ 3; Def. 56.1 at 11; Migratory Bird Permits; Regulation for Double–Crested Cormorant Management, 68 Fed.Reg. 12,653 (March 17, 2003)) The population recovered during the 1970s and 1980s, but its growth rate slowed during the 1990s. (Pl. 56.1 ¶ 3; Def. 56.1 at 11; FWS at 5507, 5510–11) It is not a species protected by the Endangered Species Act, 16 U.S.C. § 1531, *et seq.* The estimated population of the bird is about 2 million. (FWS at 5540)

As the population expanded and the birds became more visible, fishermen and others complained that the birds were responsible for declining fish stocks. (Pl. 56.1 ¶ 4; Def. 56.1 at 11–12; FWS at 9910) Cormorants also were drawn to the live fish raised in aquaculture facilities for human consumption. Migratory Bird Permits; Regulation for Double–Crested Cormorant Management, 68 Fed.Reg. 58,022, 58,026 (Oct. 8, 2003). Specifically, the cormorants have proved detrimental to commercial catfish farms located near the Mississippi Delta. *Id.* The birds' eating habits prompted the aquaculture industry to seek curbs on the cormorant population.[2] (Pl. 56.1 ¶ 5; Def. 56.1 at 12; FWS at 5493, 5511, 5515, 5566–68)

The Fish and Wildlife Service is the federal agency with primary responsibility for the regulation of migratory birds. 68 Fed.Reg. 12,653. Its authority to regulate the double-crested cormorant arises from the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703 *et seq.*, which implements bilateral conventions that the United States signed with Great Britain, Mexico, Japan and Russia. The double-crested cormorant received federal protection under the 1972 amendment to the Convention for the Protection of Migratory Birds and Game Mammals, Feb. 7, 1936, United States–Mexico, 50 Stat. 1311, T.S. No. 912. Under the statute's terms, protected birds may not be "take[n]" except as authorized by regulations implementing the MBTA. 16 U.S.C. § 703. According to 50 C.F.R. § 10.12: "Take means to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect." *See also*

---

**1.** All citations to "FWS" reflect the Bates numbers on the pages of the administrative record, as it was produced to the Court. The FWS is an agency within the United States Department of Interior.

**2.** Aquaculture is defined as "the raising or fattening of fish in enclosed ponds." WEBSTER'S THIRD INT'L DICTIONARY UNABRIDGED (2002).

*Newton County Wildlife Ass'n v. U.S. Forest Service*, 113 F.3d 110, 115 (8th Cir. 1997) ("take" and "kill" mean physical contact the type of which is engaged in by hunters and poachers), *cert. denied*, 522 U.S. 1108, 118 S.Ct. 1035, 140 L.Ed.2d 102 (1998).

In an attempt to address complaints about the double-crested cormorant's deleterious effects on aquaculture, the FWS adopted the Aquaculture Depredation Order ("ADO") in 1998. 50 C.F.R. § 21.47. Depredation is defined as "an act of plundering, despoiling, or making inroads." WEBSTER'S THIRD INT'L DICTIONARY UNABRIDGED (2002). The ADO permits landowners, operators and tenants of aquaculture facilities to utilize firearms to take double-crested cormorants when the birds are found committing or about to commit acts of depredation on the aquaculture stock. 50 C.F.R. § 21.47. It also permits the killing of double-crested cormorants only within the boundaries of aquaculture facilities in thirteen states. 50 C.F.R. § 21.47(c)(1).[3]

Subsequent to the ADO's issuance, the Fish and Wildlife Service continued to receive complaints about the cormorant population. By 1999, the regional offices of the Fish and Wildlife Service received an increasing number of applications for cormorant depredation permits unrelated to aquaculture, at which time FWS began to explore additional methods to control the cormorant population. (Pl. 56.1 ¶ 6; Def. 56.1 at 12; FWS at 9884–92; 9906–19) In addition to decrying the birds' effects on aquaculture, the complaints received by FWS claimed that the cormorants were destroying vegetation, causing erosion, displacing other bird species and reducing sport fish populations. (Def. 56.1 ¶ 5;

FWS at 9910) In November 1999, the Fish and Wildlife Service issued a Notice of Intent to develop a national management plan and to prepare an Environmental Impact Statement ("EIS") to consider different methods of addressing complaints over cormorant activities without unduly depleting the bird's population. (Pl. 56.1 ¶ 6; Def. 56.1 at 12; Migratory Bird Permits; Notice of Intent To Prepare an Environmental Impact Statement and National Management Plan for the Double–Crested Cormorant, 64 Fed.Reg. 60,826 (Nov. 8, 1999)) The Fish and Wildlife Service received public comments in response to the Notice of Intent, which included submissions that were both supportive and critical of widespread efforts to limit the cormorant population. (Pl. 56.1 ¶ 7; Def. 56.1 at 13; FWS at 21–119, 436–521, 608–11, 1281–87, 1292–94, 1312–19)

A so-called "Cormorant Team" formed for the purpose of evaluating methods of managing the cormorant population. (Pl. 56.1 ¶ 8; Def. 56.1 at 13) The team was comprised of staff from the Fish and Wildlife Service's Division of Migratory Birds Management, migratory bird staffers from the FWS's regional offices, in consultation with representatives of the Animal and Plant Health Inspection Service's ("APHIS") Wildlife Services division. (Pl. 56.1 ¶ 8; Def. 56.1 at 13–14; FWS at 11109) As of October 2000, the Cormorant Team considered several population-management alternatives, including, but not limited to, the following: (1) no damage control; (2) non-lethal management; (3) maintaining the then-existing system by pursuing no action; (4) increased lethal control, possibly via an expanded depredation order, (5) coordinated statewide management; (6) allowing for sport-hunting;

---

**3.** The ADO applies to Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Minnesota, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee and Texas. 50 C.F.R. § 21.47(b).

and (7) "[r]escindment of MBTA protection." (FWS at 11433)

In August 2001, the FWS's Division of Migratory Birds issued a draft Environmental Impact Statement ("Draft EIS") to the Fish and Wildlife Service's regional offices. (FWS at 2729–2891) An EIS is required by statute. 42 U.S.C. § 4332(2)(C). In the Draft EIS, the FWS set forth the proposed action of issuing a "Public Resource Depredation Order" (the "Order" or "PRDO") that would allow state and federal wildlife agencies "greater flexibility and timeliness in dealing with [double-crested cormorant]-related public resource conflicts, while maintaining Federal oversight of [double-crested cormorant] populations." (FWS at 2748) The ADO would remain in place, and expanded to permit the thirteen affected states to engage in winter roost control. (FWS at 2748) In all other states, aquaculture depredation would be addressed through depredation permits. (FWS at 2748) State and federal agencies would be required to record the location of birds taken, and population counts of the double-crested cormorant would occur at ten-year intervals. (FWS at 2748–49) In addition, state and federal authorities would be permitted to take double-crested cormorants on public lands or waters. (FWS at 2749) The Draft EIS also considered whether population-control measures would adversely affect other migratory birds or any species protected by the Endangered Species Act. (FWS at 2749)

The Fish and Wildlife Service released the Draft EIS for public comment in December 2001. Notice of Availability; Draft Environmental Impact Statement on Double–Crested Cormorant Management, 66 Fed.Reg. 60,218 (Dec. 3, 2001). As summarized in the Federal Register,

Our proposed action ... modifies the existing Aquaculture Depredation Order and establishes a new Public Resource Depredation Order to allow public resource managers greater flexibility in dealing with cormorant conflicts while ensuring Federal oversight via reporting and monitoring requirements.

*Id.* The publication of the Draft EIS was followed by a 100–day public comment period, including 10 public meetings. Notice of Availability; Final Environmental Impact Statement on Double–Crested Cormorant Management, 68 Fed.Reg. 47,603. The Cormorant Team received 994 letters, faxes and e-mails, a 32.2–percent plurality of which supported adoption of a Public Resource Depredation Order. *Id.*

On March 17, 2003, the Fish and Wildlife Service published a proposed rule adopting the PRDO. 68 Fed.Reg. 12,653. It surveyed the procedural history of the FWS's efforts to control the double-crested cormorant population, as well as the bird's geographic distribution throughout North America. 68 Fed.Reg. at 12,653–55. As one of its premises, the proposed rule stated that cormorants posed a specific threat to artificial, highly managed fish populations, and that their impact on other fish populations varied across regions. 68 Fed.Reg. at 12,655. The proposed rule also asserted that other bird species may be negatively affected by the burgeoning double-crested cormorant population, that its highly acidic guano destroyed vegetation, and that it was responsible for $25 million of lost catfish production annually. 68 Fed.Reg. at 12,655–56.

In light of the comments submitted in response to the Draft EIS, the Fish and Wildlife Service revised the terms of its proposed rule. It determined that the Public Resource Depredation Order should apply to the 24 states where the double-crested cormorant population most threatened public resources, rather than the 48 states initially proposed. *Id.* at 12,654.

"While the [FWS] has the primary responsibility of regulating [double-crested cormorant] management, on the-ground management activities are largely carried out by entities such as State fish and wildlife agencies, wildlife damage control agencies such as the Wildlife Services program of [APHIS] and, in some cases, by private citizens." *Id.* The PRDO would apply only to land and freshwater. *Id.* As approved means of population control, it permitted egg oiling, egg and nest destruction, cervical dislocation, shooting, and $CO_2$ asphyxiation. *Id.*

The Fish and Wildlife Service received nearly 10,000 public comments, approximately 85 percent of which expressed opposition to the proposed rule. (Pl. 56.1 ¶ 19; Def. 56.1 at 20) The FWS ascribes the level of opposition to organized e-mail and letter-writing campaigns. (Def. 56.1 at 20; 68 Fed.Reg. at 58,023; FWS at 6190, 6195) According to the plaintiffs, the comments submitted in response to the proposed rule were submitted by "[s]cientists, ornithological organizations, [and] environmental organizations," and largely argued that the rule "was an extreme overreaction" that risked lasting damage to double-crested cormorants and other species, and represented an overly broad grant of authority to states. (Pl. 56.1 ¶ 19) Along with the public comments received by the Cormorant Team, the proposed rule triggered sometimes-pointed disagreements within the Fish and Wildlife Service itself. *See, e.g.,* FWS at 12352, 13031, 13033–45. These intra-agency disagreements are discussed in greater detail below.

In August 2003, the Fish and Wildlife Service issued its Final Environmental Impact Statement ("Final EIS") on double-crested cormorant management. 68 Fed. Reg. 47,603. The Final EIS totaled approximately 207 pages, including appendices. (FWS at 5480–5687) It included agency responses to 74 public comments and summaries of twelve public meetings at which the Draft EIS was discussed. (FWS at 121–138, 5678–5681) It also evaluated the comparative merits and drawbacks of six alternative approaches to double-crested cormorant control. (FWS at 5536–91)

A final rule issued on October 8, 2003. 50 C.F.R. § 21.48; 68 Fed.Reg. at 58,035. In the Record of Decision implementing the new rule, the FWS noted that "[p]ublic involvement occurred throughout the [environmental impact statement] and rulemaking process. From 1999 to 2003, we held 22 public meetings over the course of 10 months of total public comment." 68 Fed.Reg. at 58,033. The Record of Decision stated that the final rule had been adopted because it was environmentally sound, cost effective, and flexible enough to satisfy different management needs around the country, and did not threaten long-term sustainability of the double-crested cormorants or other natural resources. 68 Fed.Reg. at 58,033–34. "It will provide a net benefit to fish, wildlife, and plants by allowing agencies to control [double-crested cormorants] to protect these resources from damages." 68 Fed. Reg. at 58,034.

The final rule governs the taking of double-crested cormorants on land and in the freshwater of 24 states.[4] It reads in part:

This depredation order authorizes State fish and wildlife agencies, Federally rec-

---

4. The affected states are Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, New York, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Vermont, West Virginia and Wisconsin. 50 C.F.R. § 21.48(b).

ognized Tribes, and State Directors of [APHIS's Wildlife Service Program] to prevent depredations on the public resources of fish (including hatchery stock at Federal, State, and Tribal facilities), wildlife, plants, and their habitats by taking without a permit double-crested cormorants found committing or about to commit, such depredations.

50 C.F.R. § 21.48(c)(1). The rule provides that non-lethal control methods should first be attempted as a means of population control. 50 C.F.R. § 21.48(d)(1). Thereafter, double-crested cormorants "may be taken only by means of egg oiling, egg and nest destruction, cervical dislocation, firearms, and $CO_2$ asphyxiation." 50 C.F.R. § 21.48(d)(2). The rule specifies acceptable forms of shotgun shot and egg-oiling substances. *Id.* "Nothing in this depredation order authorizes the take of any migratory bird species other than double-crested cormorants." 50 C.F.R. § 21.48(d)(7). The rule also included measures intended to protect bird species such as the anhinga, the neotropic cormorant, the piping plover, the interior least tern, the wood stork and the bald eagle from any impact from the rule's implementation. 50 C.F.R. § 21.48(d)(7), (8). Any agency whose single control action would kill more than 10 percent of a breeding colony is bound by pre-clearance procedures. 50 C.F.R. § 21.48(d)(9)(i), (12). In addition to adopting the PRDO, the FWS also amended the ADO to allow the take of double-crested cormorants at their winter roost sites. 68 Fed.Reg. at 58,031. In the Final EIS, the defendants estimate that the annual take of double-crested cormorants will total 159,635 birds, out of a total continental population of approximately two million. (FWS at 5540) Approximately eight percent of the bird's total population will be taken each year. (FWS at 5540)

Plaintiffs commenced this action by filing their Complaint on February 5, 2004.

Though the cormorants' depredation of commercial aquaculture appears to have the greatest impact in the lower Mississippi region, New York is one of 24 states affected by the PRDO, and venue is clearly proper. An Amended Complaint ("AC") was filed on May 13, 2004. The plaintiffs are comprised of organizations that work on behalf of the protection and preservation of native wild animals, and include individual persons located throughout the United States who describe themselves as avid bird watchers and photographers. (AC ¶¶ 3, 7, 11, 15, 19, 22, 26, 29, 32) Plaintiffs challenge the PRDO, codified at 50 C.F.R. § 21.48, for its alleged failure to comply with the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 *et seq.,* the Fish and Wildlife Service's own implementing regulations, 50 C.F.R. § 21 *et seq.,* the Endangered Species Act, 16 U.S.C. § 1531 *et seq.,* the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* and the Administrative Procedure Act, 5 U.S.C. § 706. They also seek declaratory and injunctive relief declaring the ADO, the PRDO, and the Record of Decision to be in violation of governing law and setting them aside, and awarding costs and attorneys' fees. Defendants filed their answer to the AC, and both sides moved for summary judgment shortly thereafter.

*Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material

if it "might affect the outcome of the suit under the governing law ..." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e), Fed.R.Civ.P. In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Medical Examiners*, 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accord Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. *See* Fed.R.Civ.P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

"Summary judgment is particularly appropriate in cases in which the court is asked to review or enforce a decision of a federal administrative agency." Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2733 (3d ed.1998). When a court reviews a final agency decision, the summary judgment standard also takes into account 5 U.S.C. § 706(2) of the Administrative Procedure Act ("APA"). Section 706 of Title 5 states:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall -
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be -
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an

agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

A reviewing court must "engage in a substantial inquiry" of the administrative record before the agency, but "the ultimate standard of review is a narrow one," and the reviewing court "is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on unrelated grounds, Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The Court's review must be "thorough, probing, [and] in-depth...." *Id.* at 415, 91 S.Ct. 814.

■ Although the parties disagree as to the characterization and weight afforded to certain facts, they do not present any genuine disputes of material fact. Because there is no dispute as to any material fact, summary judgment is appropriate in this case.

*Standing*

■ The defendants challenge the standing of plaintiffs Humane Society of the United States, Animal Rights Foundation of Florida, Gustav Verdeberer and Julie Baker. They do not challenge the standing of the other plaintiffs, who, as part of their moving papers, proffer declarations that assert their standing. In response to a summary judgment motion that challenges a plaintiff's standing, a plaintiff may not rest on allegations of injury, and must set forth by affidavit or other evidence the basis for which they assert standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Although defendants are correct that not all plaintiffs included affidavits as part of the moving papers, in opposition to the defendants' summary judgment motion, the defendants proffer the affidavits of Ms. Baker and Mr. Verdeberer. These affidavits satisfy the factual threshold necessary for standing.

*Lujan* made clear that to survive a motion for summary judgment that challenges a plaintiff's standing, one or more members of a plaintiff organization must offer specific facts sufficient to show that they are (or would be) directly affected by that action. *Id.* at 563, 112 S.Ct. 2130. The failure of the Humane Society of the United States and the Animal Rights Foundation of Florida to submit any member affidavit containing facts sufficient to show standing requires these parties to be dismissed from the action. *See id.; accord Sierra Club v. Morton*, 405 U.S. 727, 736, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (although the litigation was labeled a "public" action and involved the use of natural resources, plaintiff Sierra Club's failure to offer facts showing particularized injury required dismissal of party for lack of standing).

■ The absence of any affidavit from these two organizations contrasts with the affidavits submitted by Janet Runyan on behalf of Defenders of Wildlife. Ms. Runyan, a resident of Pickford, Michigan, described the personal and aesthetic pleasure derived from the double-crested cormorant. (Plaintiffs' Ex. 19) Similarly, on behalf of the Fund for Animals, Marian Probst, a resident of New York, NY, described her lifelong affection for double-crested cormorants and the injuries she would incur if their population diminished. (Plaintiffs' Ex. 19) Environmental plaintiffs have suffered cognizable injury when aesthetic and recreational enjoyment are hindered by a certain action. *Friends of the Earth, Inc. v. Laidlaw Environmental*

*Services (TOC), Inc.,* 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

Plaintiffs Humane Society of the United States and the Animal Rights Foundation of Florida set forth no facts showing such an injury. As such, they are dismissed from this action for lack of standing.

*Discussion*

▇ Plaintiffs argue that the Public Resource Depredation Order violates the Migratory Bird Treaty Act, the MBTA's conventions, and is arbitrary and capricious under the APA. They also argue that the PRDO violates the Fish and Wildlife Service's own implementing regulations. Plaintiffs argue that the failure to undertake a formal intra-service consultation as to the impact of the depredation orders violated the Endangered Species Act. Lastly, they argue that both the Fish and Wildlife Service and the Animal and Plant Health Inspection Service violated the National Environmental Policy Act in the Final EIS that analyzed the PRDO.

I address each of these arguments in turn.

I. *Does the Agency's Order Comply with the Migratory Bird Treaty, Its Conventions, and Implementing Statute?*

The Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.,* was signed into law in 1918 and has since been amended three times, most recently in 1989. It implements four bilateral migratory bird treaties signed between the United States and Canada (entered on Canada's behalf by Great Britain), Mexico, Japan and the U.S.S.R. Convention for the Protection of Migratory Birds, Aug. 16, 1916, U.S.-Gr. Brit., 39 Stat. 1702, T.S. No. 628; Convention for the Protection of Migratory Birds and Game Mammals, Feb. 7, 1936, U.S.-Mex., 50 Stat. 1311, T.S. No. 912; Convention for the Protection of Birds and Birds in Danger of Extinction and their Environ-

ment, Mar. 4, 1972, U.S.-Japan, 25 U.S.T. 3329, T.I.A.S. No. 7990; Convention Concerning the Conservation of Migratory Birds and Their Environment, Nov. 19, 1976, U.S.-U.S.S.R., 29 U.S.T. 4647, T.I.A.S. No. 9073. The MBTA reads in relevant part:

> Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill ... any migratory bird, nest, or egg of any such bird ... included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat. 1702), the United States and the United Mexican States ... Japan ... and the Union of Soviet Socialist Republics.

16 U.S.C. § 703. Pursuant to 16 U.S.C. § 712(2), Congress delegated to the Secretary of Interior the power to issue regulations effectuating the four treaty conventions. Section 704(a) authorizes the Secretary of Interior, acting through the Fish and Wildlife Service, to regulate when and to what extent migratory birds may be captured or killed. 16 U.S.C. § 704. Any such decision must factor "due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds." *Id.* "Without undertaking to review the numerous decisions construing the Migratory Bird Treaty Act, it may be said in general that the authority conferred upon the Secretary of the Interior has been liberally construed." *Bailey v. Holland,* 126 F.2d 317, 322 (4th Cir.1942).

In *State of Missouri v. Holland,* 252 U.S. 416, 435, 40 S.Ct. 382, 64 L.Ed. 641

(1920), Justice Holmes, writing for the Court, observed that the Migratory Bird Treaty signed between the United States and Great Britain established a national approach to the management of migratory bird populations. "Wild birds are not in the possession of anyone.... The whole foundation of the State's rights is the presence within their jurisdiction of birds that yesterday had not arrived, tomorrow may be in another State and in a week a thousand miles away." *Id.* at 434, 40 S.Ct. 382. "Here, a national interest of very nearly the first magnitude is involved. It can be protected only by national action in concert with that of another power." *Id.* at 435. *Missouri v. Holland* acknowledges that under the Treaty, the signatories, including the United States, have ceded absolute and unfettered control over the management of migratory bird populations. *Id.* at 434, 40 S.Ct. 382. This includes the control once exercised by the individual sovereign states. *Id.* at 434–35, 40 S.Ct. 382.

Although the statute that implements the Treaty, the MBTA, is a criminal statute that establishes strict liability for individuals responsible for the death of protected birds, *see United States v. FMC Corporation,* 572 F.2d 902, 907–08 (2d Cir. 1978), courts have held that private plaintiffs may, via the Administrative Procedure Act, pursue claims against agencies for failure to adhere to the MBTA's terms. *See, e.g., Hill v. Norton,* 275 F.3d 98, 103 (D.C.Cir.2001) ("Because the MBTA does not create a private right of action or otherwise provide a process for judicial review, the Secretary's disputed failure to include the mute swan on the *List of Migratory Birds* can only be challenged by [plaintiff] under the APA."). The plaintiffs argue that in adopting the PRDO, the Fish and Wildlife Service abdicated a statutory responsibility under the MBTA to determine whether cormorant removal is warranted or compatible with the Treaty's conventions, inasmuch as the PRDO permits states and tribes to make decisions as to the cormorant population without regard to factors listed under the MBTA. In the plaintiffs' view, the terms of 50 C.F.R. § 21.48(c)(1), allowing for the taking of double-crested cormorants engaged in depredation, contradicts section 704's mandate to the Secretary of the Interior to determine "when, to what extent" and "by what means" a protected bird may be taken or killed.

### A. *The Agency's Order Does Not Conflict With the Statute.*

I first consider whether the PRDO conflicts with the terms of the MBTA. The FWS adopted the PRDO pursuant to the Administrative Procedure Act's "notice-and-comment" rulemaking, or so-called "informal" rulemaking. The APA establishes three requirements for such rulemaking: First, the agency gives prior notice through the Federal Register. 5 U.S.C. § 553(b). After publication of notice, the agency must "give interested persons an opportunity to participate" through written comments. 5 U.S.C. § 553(c). Following consideration of public comments, the agency must issue "a concise general statement of ... basis and purpose." *Id.*

The Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), set forth the circumstances in which a reviewing court defers to an agency's statutory interpretations:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the

matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

The judiciary is "the final authority" on statutory construction. *Id.* at 843 n. 9, 104 S.Ct. 2778. If Congress has not directly spoken to the disputed issue, however, then an administrative agency is empowered to fill any gaps left by the statute. *Id.* at 843–44, 104 S.Ct. 2778. "Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778.

Prior to enactment of the PRDO, the FWS had established two regulations by which the agency could authorize the taking of migratory birds that were causing depredation to agriculture. Under 50 C.F.R. § 21.41, the FWS may issue a depredation permit that allows the taking of migratory birds on a site-specific basis. A second regulation, 50 C.F.R. § 21.42, empowers the FWS to issue a depredation order that permits the taking of migratory game birds when they "have accumulated in such numbers in a particular area as to cause or about to cause serious damage to agricultural, horticultural, and fish cultural interests." Other regulations promulgated by the FWS, 50 C.F.R. §§ 21.43–21.46, have established depredation orders for other species of migratory birds.

In recent years, the United States Court of Appeals for the District of Columbia has twice found that the Department of Interior and FWS acted in contravention to the MBTA's terms when taking regulatory action that allowed for the taking of migratory birds. *See Humane Society of the United States v. Glickman,* 217 F.3d 882 (D.C.Cir.2000) (Interior Department violated terms of the MBTA in issuing interpretive policy statement that allowed federal agencies to kill or take the Canada goose (*Branta canadensis* ) without a permit); *Hill,* 275 F.3d at 105–06 (Interior secretary failed to comply with MBTA's terms by striking mute swans from list of protected migratory birds).

More recently, in *Fund for Animals v. Williams,* 246 F.Supp.2d 27, 41 (D.D.C. 2003), *amended on other grounds,* 311 F.Supp.2d 1 (D.D.C.2004), a district court upheld the FWS's final rule from a challenge under the APA and MBTA. The FWS issued a rule that expanded the hunting season of the trumpeter swan (*Cygnus buccinator*) in Montana, Utah and Nevada. *Id.* at 31. The rule included a quota on the number of trumpeter swans that could be killed within a hunting season. *Id.* The court followed a two-step approach in determining whether the FWS's rule conflicted with Congress's clear intent. First, it evaluated the extent to which the agency action conformed to the terms of the MBTA:

> Consistent with the MBTA's "due regard" directive, each of the three final [Environmental Assessments] issued by the [FWS] described the Trumpeter swans' distribution, population level (or abundance), breeding habits, migratory path (or lack thereof), and local economic impacts. Each [Environmental Assessment] also analyzed the impact of the preferred management proposal and other management alternatives.... The court therefore concludes that the

defendants gave "due regard" to the MBTA factors.

*Id.* at 40 (internal citations omitted). Having found the FWS's approach consistent with statutory authority, the court next considered the manner in which the quota authorization should be evaluated for compatibility with "the terms of the convention," as set forth by section 704(a). *Id.* at 39. The court ruled that only the U.S.-Canada and U.S.-Mexico conventions—rather than all four migratory bird conventions—pertained to trumpeter swans. *Id.* It grounded its analysis of the defendants' actions in the U.S.-Canada convention, which the court deemed the more restrictive of the two. *Id.* Under the U.S.-Canada convention, the signatories were to "ensure a variety of sustainable uses, sustain healthy populations for harvesting needs, and restore depleted populations" of listed migratory birds, including swans. *Id.* at 40. Still, the court characterized the FWS's approach as "gambling" that its solution would lead to a healthier, more viable trumpeter swan population. *Id.* The court deferred to the FWS's expertise in making this "gamble," and found the hunting quota permissible under the U.S.-Canada convention. *Id.*

Consistent with *Chevron,* I first turn to whether the PRDO contradicts the language of the MBTA, or whether, in the alternative, it is the product of an agency effort to fill in statutory gaps. 467 U.S. at 842–43, 104 S.Ct. 2778. Having closely scrutinized the terms of the MBTA and the PRDO, I find no conflict between the two. Section 704(a) requires the FWS to exercise "due regard" for zone of temperature, distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of protected birds. In setting forth its rationale for adopting the PRDO, the FWS evaluated the double-crested cormorants' migration routes and breeding habits. (FWS at 5506–07, 5512–

13) It addressed the bird's continent-wide population, conservatively estimating the number to be 2 million, though the highest estimate totaled 2,426,353. (FWS at 5507–08, 5510–11) The FWS evaluated the distribution and zone of population of the bird's population, dividing the cormorant's population into four segments of North America. (FWS at 5508–10; 68 Fed.Reg. at 58,024–025) The economic impacts of the double-crested cormorant were discussed in light of the bird's aquaculture depredation. (FWS at 5524–29)

The PRDO's approach to managing the cormorant population—essentially, granting limited discretion to federally recognized tribes, and state fish and wildlife agencies, and state directors of APHIS's Wildlife Services programs—does not contradict any provision in the MBTA's text. The MBTA vests the Interior Secretary with the power "to determine when, to what extent, if at all, and by what means" the taking of birds is permissible, and "to adopt suitable regulations permitting and governing the same...." 16 U.S.C. § 704(a). The PRDO does precisely that. In drafting and adopting the PRDO, it was the FWS's duty to balance the factors set forth by the MBTA. The FWS's ultimate delegation of authority to regional FWS and state APHIS Wildlife Services directors, state agencies and federally recognized tribes does not depart from the MBTA's language or intent.

Nor does the PRDO unduly cede federal power to the states, or vary from the national approach to bird management required by the MBTA. The "national action" envisioned by *Missouri v. Holland* is not undercut by virtue of the PRDO's limited grant of power to state agencies and regional branches of the FWS. The FWS has not abdicated its authority, or granted states free reign over management of the

cormorant population. To the contrary, agencies seeking to initiate control activities must first provide notice to the appropriate Regional Migratory Bird Permit Office and provide a detailed description of the proposed population control activity, including the location of the activity, a description of how the cormorant impacted public resources, and how many birds are likely to be taken. 50 C.F.R. § 21.48(d)(9). Double-crested cormorants may be taken only according to prescribed methods. 50 C.F.R. § 21.48(d)(2). This contrasts with *United States Telecom Association v. Federal Communications Commission*, 359 F.3d 554, 565–68 (D.C.Cir.), *cert. denied*, — U.S. —, 125 S.Ct. 313, — L.Ed.2d — (2004), in which the D.C. Circuit struck down the Federal Communications Commission's decision to subdelegate its decisionmaking authority to state commissioners. In that case, the FCC "delegated to another actor almost the entire determination of whether a specific statutory requirement" was fulfilled. *Id.* at 567.

In light of the foregoing, I conclude that the PRDO does not conflict with the MBTA.

B. *The Agency's Order Does Not Conflict with Individual Treaty Conventions*

■ Having found no conflict between the PRDO and the MBTA's text, I turn to whether the PRDO "is compatible with the terms of the conventions...." 16 U.S.C. § 704(a). As already noted, *Williams* concluded that agency action should be evaluated for compliance only as to conventions that explicitly govern the disputed bird species, not for compliance with all four conventions. 246 F.Supp.2d at 39. "Although the MBTA covers all of the migra-

tory birds listed by the treaties, each treaty does not list all of the migratory birds covered by the MBTA." *Id.* (citation omitted). "If the court were to interpret each of the treaties to apply to all birds covered by the MBTA ... the court in effect would be multilateralizing the U.S.' bilateral treaty obligations. The court declines the plaintiffs' invitation to unilaterally redefine this nation's international commitments." *Id.* at 39 n. 13.

I find the *Williams* rationale persuasive.[5] Applying the text of a convention that is not, by its terms, applicable to a particular species, would transplant protections or limitations from one treaty to another in ways that were not anticipated by the signatories. Plaintiffs cite *Alaska Fish and Wildlife Federation & Outdoor Council v. Dunkle*, 829 F.2d 933, 938, 941 (9th Cir.1987), *cert. denied*, 485 U.S. 988, 108 S.Ct. 1290, 99 L.Ed.2d 501 (1988), for the principle that the PRDO must be compatible with all four migratory bird conventions. In *Dunkle*, all four treaties governed the migratory birds in dispute. *Id.* at 941. Hence, *Alaska Fish and Wildlife Federation* is distinguishable from the present action. Accordingly, I evaluate the PRDO for compatibility only as to conventions that protect the cormorant.

I have examined each of the four conventions, and the only convention that applies to the cormorant by name is the U.S.-Mexico convention. Convention for the Protection of Migratory Birds and Game Mammals, Feb. 7, 1936, U.S.-Mex., 50 Stat. 1311 (as amended by exchange of notes dated Mar. 10, 1972). The Notice of the Final Rule cites to the convention with Mexico in asserting the PRDO's compliance with applicable conventions. 68 Fed. Reg. at 58,023.[6]

---

**5.** As noted by plaintiffs, *Williams* is currently on appeal to the D.C. Circuit.

**6.** The Record of Decision also cited to the U.S.-Russia convention: "The Russian con-

■ Plaintiffs argue that the PRDO violates the U.S.-Mexico treaty because the treaty requires "[t]he establishment of close seasons" for the taking of protected birds, and the PRDO does not provide for a close season. Convention for the Protection of Migratory Birds, Feb. 7, 1936, U.S.-Mex., 50 Stat. 1311, 1312, Art. II(A). Article II(A) reads in full:

The high contracting parties agree to establish laws, regulations and provisions to satisfy the need set forth in the preceding Article, including:

A) The establishment of close seasons, which will prohibit in certain periods of the year the taking of migratory birds, their nests or eggs, as well as their transportation or sale, alive or dead, their products or parts, except when proceeding, with appropriate authorization, from private game farms or when used for scientific purposes, for propagation or for museums.

Article I states:

In order that the species may not be exterminated, the high contracting parties declare that it is right and proper to protect birds denominated as migratory, whatever may be their origin, which in their movements live temporarily in the United States of America and the United Mexican States, by means of adequate methods which will permit, in so far as the respective high contracting parties may see fit, the utilization of said birds rationally for purpose of sport, food, commerce and industry.

Article IV of the Convention lists protected birds, dividing them between game birds and non-game birds. The cormorant family was not included as a protected bird under the original 1964 Convention, but was added pursuant to 1972 amendments. The 1972 amendments did not distinguish between game and non-game migratory birds, and, prior to listing the 32 species to be protected by the supplemental agreement, merely stated that "the following additions be made to the list of birds set forth in Article IV of the Convention...." Convention for the Protection of Migratory Birds, Feb. 7, 1936, U.S.-Mex., 50 Stat. 1311, 1312. There is no dispute between the parties that the double-crested cormorant is not a game bird. (Plaintiffs' 56.1 ¶ 1; Defendants' 56.1 at 10)

In the defendants' view, the phrases "close season" or "closed season" is a term of art that exclusively refers to game hunting. For instance, a separate regulation issued by the FWS, 50 C.F.R. § 20.11(b)(2), defines "closed season" as "the days on which migratory *game* birds shall not be taken." [7] (emphasis added) In support of this proposition, the defendants cite to dictionaries that define a "closed season" as a term of art specific to game hunting. RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, at 389 (2d ed.1987) (closed season is "a period usually for a specific part of the year during which angling or hunting for a given species is legally prohibited."); WEBSTER'S THIRD INT'L DICTIONARY OF THE ENGLISH LANGUAGE,

vention ... provides an authority to cover [*double-crested cormorants*] even though not listed in the Appendix. To the extent we choose to apply the convention, it contains an exception from the prohibition that may be made for the protection against injury to persons or property. We note, therefore, that there is no conflict between our responsibility for managing migratory birds and our select-

ed action." 68 Fed.Reg. at 58,023. Plaintiffs do not argue that there is any conflict between the PRDO and the terms of the U.S.-Russia convention.

7. The FWS has defined "closed season" as such since at least 1988. 53 Fed.Reg. 24,284 (June 28, 1988) (adopting final rule, including present definition of closed season).

at 427 (1971) ("closed" defined as "restricted with respect to time or place for taking game."); NEW STANDARD DICTIONARY OF THE ENGLISH LANGUAGE, at 504 (rev'd ed.1963) (close season defined as "that part of the year in which it is unlawful to catch or kill specified varieties of fish and game."); *see also* THE OXFORD ENGLISH DICTIONARY Vol. III, at 344 (2d ed.1989) (close season defined as "closed for the purposes of sport; during which the killing of certain kinds of game or fish is illegal.").

The word choice of "close season" implies that there must also be an "open season" during which the taking of birds is permissible. If "close season" applied to all birds protected under the convention, then, by extension, all birds would be subject to an open season, even, conceivably, those species designated as endangered.

The Agency's interpretation of Article II(A), that it applies to fewer than all migratory birds covered by the Convention, is consistent with the other subdivisions of Article II. Certain subdivisions appear to apply to all species, such as the prohibition of hunting from aircraft. Article II(F). Other divisions, however, could not logically apply to all species. Article II(D) establishes a close season for wild ducks, extending from March 10 to September 1. Article II(E) conditionally bans killing migratory insectivorous birds. Article II(C), like Article II(A), is written in broad terms that may have been intended, in fact, to apply to fewer than all migratory birds. Article II(C) establishes a "limitation to their hunting to four months in each year, as a maximum, under permits issued by the respective authorities in each case."

The subdivisions of Article II are not precisely parallel. One or more clearly applies to *all* migratory birds, while some articles apply to a subset. Article IV of the Convention carefully distinguishes game birds and non-game birds, but then does not expressly distinguish the protections afforded to the two categories. This is consistent with an interpretation that the signatories understood that the distinction was implied in other portions of the Convention. True, the 1972 amendments, which included the cormorant, did not identify which of the newly added species were game birds and which were not. But that do not evince an intention to abandon a distinction between the two categories. As one commentary has observed, the U.S.-Mexico Convention, and, specifically, Article II(A), is not a model of clarity. MICHAEL J. BEAN & MELANIE J. ROWLAND, THE EVOLUTION OF NATIONAL WILDLIFE LAW, at 66 n. 19 (3d ed.1997). "The Mexican Convention is quite inartfully drafted insofar as the establishment of closed seasons is concerned.... The ambiguity arises from [A]rticle IV, however, which lumps all migratory birds into only two categories: migratory game birds and migratory nongame birds. If the latter grouping was intended to include any birds other than 'migratory insectivorous birds,' then the Convention fails to indicate what closed or open seasons are to apply to such other birds." *Id. Cf.* Omar N. White, *The Endangered Species Act's Precarious Perch: A Constitutional Analysis Under the Commerce Clause and the Treaty Power,* 27 ECOLOGY L.Q. 215, 227 n. 72 (2000) ("The treaty with Mexico offers more protections allowing for the establishment of closed seasons for hunting *game birds,* including taking prohibitions and an absolute prohibition of the killing of insectivorous birds.") (citing Articles II(A), II(E)) (emphasis added). The U.S.-Mexico Convention contrasts with the Article II(2) of the U.S.-Canada Convention, which distinguishes closed seasons on the hunting of migratory game birds as opposed to other protected birds.

In this context, the term "close season" either could be a term of art reserved for game birds, or it could mean a period of time when the taking of any bird (game or non-game) is prohibited. The Agency's interpretation that "close season" is a term of art applicable to game birds—of which the cormorant is not one—is a reasonable interpretation of the Convention. It is consistent with usage of the term as defined in popular dictionaries and at least one Agency regulation, albeit one adopted in a different context. 50 C.F.R. § 20.11(b)(2).

■ Faced with two opposing constructions of Article II(A), I consider the deference traditionally owed to the executive branch in interpreting an international treaty. The MBTA authorizes and directs the Secretary of the Interior to interpret the Conventions. 16 U.S.C. §§ 704(a), 712(2). Although the executive branch's interpretation of a treaty does not warrant deference when that interpretation conflicts with a treaty's clear language or purpose, *United States v. Alvarez-Machain*, 504 U.S. 655, 687 n. 35, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) (collecting cases) (Stevens, J., dissenting), federal courts "owe respect to the views of the Executive Branch in regard to the meaning of an international treaty," provided that the interpretation is reasonable. *Ehrlich v. American Airlines, Inc.*, 360 F.3d 366, 399 (2d Cir.2004); *accord El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); *Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1251 (D.C.Cir.2003) ("[C]ourts should give great weight to the views of those executive agencies charged with enforcing particular treaties.").

Article II(A) and its use of the term "close season" are ambiguous. The text of the Convention does not allow me to conclude whether Article II(A) applies to all migratory birds protected by that Convention, or exclusively to migratory game birds. In the absence of express guidance from the Convention or Congress, I accept as reasonable the FWS's interpretation that Article II(A) governs the taking of migratory game birds only. As such, the PRDO, which allows the year-round taking of double-crested cormorants, does not violate the U.S.-Mexico Convention.

C. *The Agency Was Not Arbitrary and Capricious in Adopting the Order*

■ The next relevant consideration is whether the FWS adopted the PRDO in an arbitrary and capricious manner. *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778. "In all cases, agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Overton Park*, 401 U.S. at 413–14, 91 S.Ct. 814 (quoting 5 U.S.C. §§ 706(2)(A–D)). Decisions are "entitled to a presumption of regularity ... [b]ut that presumption is not to shield [the] action from a thorough, probing, in-depth review." *Id.* at 415, 91 S.Ct. 814 (internal citation omitted). "[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* at 416, 91 S.Ct. 814. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States*,

371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

 Any findings of fact by an agency must be supported by substantial evidence, a standard that " 'has been construed to mean less than a preponderance but more than a scintilla.' " *Cellular Phone Taskforce v. F.C.C.*, 205 F.3d 82, 89 (2d Cir.2000) (quoting *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir.1999)), *reh. denied*, 217 F.3d 72 (2d Cir.2000), *cert. denied*, 531 U.S. 1070, 121 S.Ct. 758, 148 L.Ed.2d 661 (2001). "The reviewing court must take into account contradictory evidence in the record, but the 'possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.' " *American Textile Manufacturers Institute, Inc. v. Donovan*, 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981) (quoting *Consolo v. FMC*, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)). When an agency makes a decision in the midst of disputed technical facts, courts must be reluctant to reverse an agency determination supported by considered and articulated expert opinion. *Cellular Phone Taskforce*, 205 F.3d at 89 (citing *Federal Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 465, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972)). "The agency's action should only be set aside where it relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the products of expertise." *Id.* at 89–90.

In contending that the defendants were arbitrary and capricious in adopting the PRDO, plaintiffs argue that, contrary to the PRDO's stated purpose at 50 C.F.R. 21.48(a), there were no facts in the administrative record showing that the double-crested cormorants adversely impacted public resources. Second, plaintiffs argue that the FWS has failed to articulate why its PRDO reflects "the most rational choice" for achieving its objectives under the MBTA. (Plaintiffs' Mem. at 32) Third, the plaintiffs contend that the FWS failed to adhere to the Agency's own implementing regulations in adopting both the PRDO and the ADO. I address each of these arguments in turn.

1. *The Record Supported the Conclusion that the Double–Crested Cormorant Adversely Affects Public Resources*

As stated at 50 C.F.R. § 21.48(a), "[t]he purpose of this depredation order is to reduce the occurrence and/or minimize the risk of adverse impacts to public resources (fish, wildlife, plants, and their habitats) caused by double-crested cormorants." According to the plaintiffs, it is "stated repeatedly throughout the Record" that cormorants do not impact public resources. (Plaintiffs' Mem. at 32)

The administrative record as to double-crested cormorants' effect on public resources reflects a vigorous difference of opinion between well-informed experts. For instance, a memorandum authored by the regional director of the Fish and Wildlife Service Region 2, an area that includes Albuquerque, New Mexico, argued that the Final Environmental Impact Statement endorsing the PRDO was "not the best way to handle localized depredation problems," and that increased local damage control would work more effectively in Region 2. (FWS at 2717, attached at Plaintiffs' Ex. 6) The memo contends that the FWS should further study how the PRDO would affect the taking of other birds, and

that the PRDO did not adequately address the cormorants' economic effects on federal and Native American fish hatcheries. (FWS at 2718) Plaintiffs also point to a memorandum authored by the regional director of the Fish and Wildlife Service Region 6, an area including Denver, Colorado. (FWS at 5237–40) That memorandum argued, *inter alia:*

> The scope of the actions, given the lack of substantial information on the impacts of [the double-crested cormorant] on the affected environment, need [sic] to be revisited. With the possible exception of aquaculture interests, the need for wide-scale management is generally not supported by the available data. Range-wide negative effects of [the double-crested cormorant] on vegetation, other bird species, water quality, human health and safety, threatened and endangered species, sport, recreational and commercial fisheries, local recreational fishing based economies, and property losses have not been confirmed by our data. The initiation of night time roost site control under the [PRDO] increases the chance of take of "look alike species".

(FWS at 5237–38) The Region 6 memorandum also observed that there was an absence of public support for adopting the PRDO, and that "[a]n overwhelming majority of responses gathered during the official public comment periods were against the proposed rule...." (FWS at 5238–39)

Criticism of the methods adopted in the PRDO also arose within the FWS's Cormorant Team. One internal e-mail criticized the Draft EIS for not including sufficient analysis of the biological and economic effects experienced by fisheries. (FWS at 11189) Another e-mail within the Team criticized the proposed PRDO for failing to adequately evaluate the link between managing the double-crested cormorant population and the bird's effect on fish populations, including fisheries. (FWS at 11204–05)

Outside persons and entities also disputed the FWS's assessments as to the environmental impact of the double-crested cormorants. A letter on behalf of the American Ornithologists' Union argued that a predation order would place too much weight on the complaints of aquaculture and hatcheries, problems that could be addressed by redesigning facilities. (FWS at 3356–58) A separate letter from three Alabama environmental groups contended that, contrary to the FWS's stated goal of enhancing the populations of other species, the PRDO would lead to adverse effects on other bird populations. (FWS at 3337) Great Lakes water bird biologists Linda Wire and Francine Cuthbert also submitted a memorandum opposing the proposed rule because, *inter alia,* it threatened the populations of other bird species, and categorized as "depredation" certain "basic components of most fish-eating bird activity." (FWS at 6260–6269)

The FWS acknowledged the existence of disputed facts as to the double-crested cormorant, but also set forth evidence supporting the PRDO's necessity. In the Final Environmental Impact Statement, the FWS noted the widely varying effect that the double-crested cormorant had on fish populations. For instance, in one study conducted in a Wyoming river, the percentage of sport and commercial fish in the double-crested cormorants' diets varied widely, from 0.6 percent to 93 percent. (FWS at 5544) The FWS found that:

> (1) [double-crested cormorants] are generalist predators whose diet varies considerably between seasons and locations and tends to reflect species composition; (2) The present composition of cormorant diet appears to have been strongly

influenced by human-induced changes in the natural balance of fish stocks; (3) "Impact" can occur at different scales, such that ecological effects on fish populations are not necessarily the same as effects on recreational or commercial catches, or vice versa; (4) Cormorant impact is generally most significant in artificial, highly managed situations; and (5) Because environmental and other conditions vary locally, the degree of conflicts with cormorants will vary locally.

(FWS at 5544–45) Research conducted at New York's Oneida Lake and at Lake Ontario also found that cormorant predation "is likely a significant source of fish mortality" at these locations, and was negatively affecting recreational catch. 68 Fed.Reg. at 58,025.

The double-crested cormorant also had "economically significant" effects in "the southern catfish-producing region." 68 Fed.Reg. at 58,026. "USDA researchers have found that as much as 75 percent of the diet of [double-crested cormorants] in these areas consists of catfish." *Id.* The cormorant's diet was found to impact commercial aquaculture in the Mississippi Delta region, with the birds consuming "approximately 49 million fingerlings each winter, valued at $5 million." *Id.* The replacement value of the consumed catfish totaled $25 million, or slightly less than 10 percent of the $261 million in catfish sales experienced by Mississippi growers in 2001. *Id.* Managers at state and federal hatcheries in the South and Upper Midwest also reported depredation at those hatcheries. *Id.* There, unsuccessful cormorant attacks and anti-cormorant noise-makers caused stress on the part of the fish population. *Id.* "Additionally, disease

and parasites can spread more easily by the presence of fish-eating birds." *Id.*

Biologists also expressed concerns that other bird species—black-crowned night herons, common terns, and great egrets—may have been negatively affected by double-crested cormorants at site-specific levels. *Id.* The "highly acidic" guano of the double-crested cormorant "kills ground vegetation and eventually the nest trees," and the trees ultimately were damaged "by stripping leaves for nesting material and breaking branches due to the combined weight of the birds and their nests." *Id.*

A memorandum dated June 10, 1999, apparently authored by John Trapp of the FWS's Office of Migratory Bird Management, summarized the then-available history of the cormorant population and the challenges posed by the bird's population growth.[8] Between 1966 and 1996, the double-crested cormorant population grew 6.1 percent per year in the eastern two-thirds of North America. (FWS at 9910) "In recent years, there have been increased complaints that cormorants are destroying vegetation, causing erosion, and displacing herons, terns, and other species at nesting sites, although most of these impacts are not well documented or understood." (FWS at 9910) The document observed that the "cormorant problem" was as much about sport fish management policies as it was the allocation of public resources between humans and wildlife. (FWS at 9910) Among the problems caused by the population growth, the memorandum noted

concerns among some segments of the public about the possible impacts of privately stocked ponds, aquaculture stocks, sensitive plant and animal communities, human health (quality of public

---

8. In defendants' papers, Mr. Trapp is identified as a wildlife biologist, although his position and job title are not immediately apparent in the memorandum. (Def. Reply at 23)

water supplies) and safety (bird-aircraft collisions), and private property values. (FWS at 9919) It proposed seventeen possible approaches to change the breeding habits and behavior of double-crested cormorants. (FWS at 9911–17)

In addition, while no one disputes that the FWS's proposal to adopt the PRDO prompted opposing arguments that were well-reasoned and put forth in good faith, it is likewise clear that many biologists and state and federal agencies supported heightened population control, via the PRDO or other methods. Proponents included state agencies, municipalities, private citizens, and fishing interests. (FWS at 6198–6248, 6643–6828, 6870–6926)

So long as an agency considers all relevant evidence, a factual finding is not arbitrary and capricious simply because conflicting evidence exists. *Cellular Phone Taskforce*, 205 F.3d at 93; *see also Public Citizen, Inc. v. National Highway Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C.Cir.2004) (policy disagreement does not make agency action arbitrary and capricious, provided that the agency considers relevant evidence). Moreover, "the mere existence of internal disagreements between agency experts does not make the agency's decision arbitrary or capricious." *National Wildlife Federation v. Norton*, 306 F.Supp.2d 920, 928 n. 15 (E.D.Cal. 2004).

True, the supplementary information accompanying the final rule noted that "there is a need for more information about [double-crested cormorants] and their impacts on resources across a variety of ecological settings." 68 Fed.Reg. at 58,023. "While [double-crested cormorant] populations are currently tracked by a number of regional and national surveys, the Service concurs with many reviewers of the proposed rule, and recognize that better information on population status

and trends is desirable." *Id.* The FWS proceeded to note the need for specific research into changes in breeding population, cormorant-caused fish mortality, the double-crested cormorant population density in light of control activities, and "studies to address human dimensions" of double-crested cormorant conflicts. *Id.* at 58,024. However, far from reflecting a lack of evidence in support of the PRDO, the FWS indicates willingness for flexibility and a recognition of possible drawbacks to its decision:

The Service has weighed these deficiencies against the costs of taking no action, and we believe it is prudent to move forward as outlined in this final rule. In making a decision about whether or not to extend the depredation orders, the Service will review and consider all additional research that has been conducted that evaluates the effects of the proposed action on fish stocks and other resources.... Our expectation is that the annual reports in the depredation orders, especially the monitoring and evaluation data associated with the public resources depredation order, will provide substantive increases in scientific and management knowledge of [double-crested cormorants] and their impacts.

*Id.* at 58,023–24. Thus, in adopting the PRDO, the FWS concluded that, despite the need for further study as to certain qualities of the cormorant population, a population-control method was necessary.

The vigorous and thoughtful debate over the cormorant's impact on public resources does not equate to a lack of substantial evidence, as required by *Overton Park* and the APA. The defendants have presented a significant fact record showing the double-crested cormorant's effect on public resources. In finding that the double-crested cormorant has adversely affected public resources, the FWS falls comfortably with-

in the Second Circuit's standard for finding substantial evidence—"less than a preponderance but more than a scintilla." *Cellular Phone Taskforce*, 205 F.3d at 89.

### 2. *The Order is a Reasonable Method of Effectuating Agency Goals.*

 Plaintiffs next contend that the PRDO is arbitrary and capricious inasmuch as it does not reflect "any rational connection between the regulation and the purpose to be served by the statute." *Skubel v. Fuoroli*, 113 F.3d 330, 336–37 (2d Cir.1997). A reasonable interpretation " 'reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' expressed intent.' " *Perry v. Dowling*, 95 F.3d 231, 236 (2d Cir.1996) (quoting *Rust v. Sullivan*, 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)). Plaintiffs' argument is without merit.

 As a preliminary matter, I reject the defendants' argument that the Secretary is vested with unfettered discretion in selecting the means of implementing the MBTA, therein depriving the federal judiciary of subject-matter jurisdiction to review agency action. An agency has full and unreviewable discretion and "[t]here is no jurisdiction if the governing statute or regulations '[are] drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.' " *Schneider v. Feinberg*, 345 F.3d 135, 148 (2d Cir.2003) (*per curiam*) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)). In *Schneider*, the Second Circuit held that Congress had "expressly allow[ed] the Attorney General and the Special Master to adopt all substantive and procedural regulations" necessary to oversee the September 11th Victim Compensation Fund, a grant of discretion so absolute as to preclude judicial review. *Id.; see*

*also Overton Park*, 401 U.S. at 410, 91 S.Ct. 814 (a Congressional grant of unreviewable agency discretion "is a very narrow exception" to presumptive judicial review). In this action, the factors listed in 16 U.S.C. § 704(a), as well as the text of the Mexico Convention, provide a baseline for determining the permissible scope of an agency's action. Defendants would have this Court rule that no federal court has subject matter jurisdiction to review rulemaking that effectuates the MBTA. Such an interpretation lacks a basis in law. *See Alaska Fish and Wildlife*, 829 F.2d at 938 (federal courts have jurisdiction to review the FWS's regulations on the taking of migratory birds).

The plaintiffs' challenge to the PRDO grows out of a broad, somewhat conclusory premise—that the MBTA "requires the [FWS] to be as protective as possible of the birds." (Plaintiffs' Mem. at 32) In effect, they argue that the MBTA always requires the adoption of the least intrusive alternative to regulating the cormorant. However, both the MBTA and the U.S.-Mexico Convention allow for much greater flexibility. Section 704(a) of Title 16 explicitly delegates authority to the Secretary of Interior "to determine when, to what extent, if at all, and by what means it is compatible with the terms of the conventions to allow hunting, taking, capture, killing, possession, [and] killing" of migratory birds. The statute's clear grant of authority is, of course, conditioned on the Secretary's consideration of the affected birds' "distribution, abundance, economic value, breeding habits, and times and lines of migratory flight. . . ." 16 U.S.C. § 704(a). Rather than requiring the Secretary "to be as protective as possible" in regulating the migratory bird population, the MBTA requires federal management of the migratory bird population to weigh these factors when exercising authority.

The MBTA is intended to protect migratory birds, but the nature of that protection has received varying characterizations from courts and commentators. *Williams* described the MBTA's goals as *"management* and conservation." 246 F.Supp.2d at 39 (emphasis added). *Cf. U.S. v. Winnett,* 2003 WL 21488645, at. *1 (D.Mass. June 23, 2003) (describing MBTA as reflecting Congress's "resolve to protect migratory birds"); *United States v. Moon Lake Elec. Ass'n,* 45 F.Supp.2d 1070, 1079 (D.Colo. 1999) ("the legislative history of the MBTA supports differing interpretations," and the statute "is capable of supporting broad interpretations . . ."); *Humane Society of the United States v. Watt,* 551 F.Supp. 1310, 1319 (D.D.C.1982) ("[T]he MBTA does not impose upon the [FWS] a mandatory duty to prohibit the hunting of any species whose population, for whatever reason, is declining."), *aff'd,* 713 F.2d 865 (D.C.Cir.1983); *see also* Benjamin Means, Note, *Prohibiting Conduct, Not Consequences: The Limited Reach of the Migratory Bird Treaty Act,* 97 MICH. L.REV. 823, 831 (1998) (MBTA was enacted as a wartime food-conservation measure, premised on hopes that insectivorous birds would reduce the population of agricultural pests). The text of the MBTA does not, however, hold the FWS to a standard requiring it "to be as protective as possible" of a protected bird species.

I note that the preamble to the U.S.-Mexico Convention states that "[i]t is necessary to employ adequate measures which will permit a *rational utilization of migratory birds* for the purpose of sport as well as for food, commerce and industry." (emphasis added) Article II(E) permits the killing of insectivorous birds "when they become injurious to agriculture . . ." while Article II(C) and (D) allow for the hunting of migratory game birds. Although the double-crested cormorant is neither an insectivorous bird nor a game bird, such

provisions show that the U.S.-Mexico convention does not require the defendants to be as protective as possible in regulating migratory birds. Rather, they underscore that the Convention intended to foster "a rational utilization" of protected birds, not a mandate that the signatories never allow for the taking any protected bird.

In the notice-and-comment period, this very issue arose. The FWS addressed its conservation rationale at the time it issued the PRDO:

Comment 1: The service should protect, not kill, [double-crested cormorants].

Service Response: In the wildlife management field, the control of birds through the use of humane, but lethal, techniques can be an effective means of alleviating resource damages, preventing further damages, and/or enhancing nonlethal techniques. It would be unrealistic and overly restrictive to limit a. resource manager's damage management methods of nonlethal techniques, even if "nonlethal" included nest destruction and/or egg oiling. Lethal control techniques are an important, and in many cases necessary, part of a resource manager's "tool box."

68 Fed.Reg. at 58,026. Thus, in exercising the authority delegated to it by statute, the FWS concluded that that it needed to pursue both lethal and non-lethal means to most effectively alleviate damages to public resources. In implementing the PRDO, the FWS also noted: "We do not in any way believe that the [PRDO] interferes with our conservation mission. Our responsibility is to ensure the long-term conservation of [double-crested cormorant] populations, and we will do so. . . . We believe that managing certain species to address economic or social concerns, while ensuring the long-term conservation of

such species is consistent with our mission." 68 Fed.Reg. at 58,030.

Plaintiffs also contend that the PRDO is arbitrary and capricious because the MBTA would be better effectuated by managing the double-crested cormorant through a more narrowly drawn approach to curbing cormorant depredation. In the Final EIS, the FWS evaluated the benefits each of the six approaches offered relative to the FWS's stated goals. It is worthwhile to now review the Agency's stated rationales as to why it opted to adopt the PRDO as a means of controlling double-crested cormorants. In so doing, I contrast the PRDO (Alternative D in the drafting process) with the proposed alternative of Increased Local Damage Control (Alternative C in the drafting process). Increased Local Damage control was advocated by some commenters who conveyed hesitation about—or outright opposition to—adopting the PRDO. (*see, e.g.,* FWS at 3194, 3231–33, 3241)

Alternative C would have expanded then-existing policy "to address a broader range of resource conflicts," targeting the 13 states covered by the Aquaculture Depredation Order. (FWS at 5500) It also would have allowed for lethal control at public fish hatcheries. (*Id.*) Another proposal, "Alternative E," would have developed regional population objectives, continued non-lethal control methods on a voluntary basis, and continued the use of depredation permits. (FWS at 5502–03) In comparing these and other alternatives, the Final EIS noted that "[d]ifferences among alternatives in the degree of lethal take are primarily related to the circumstances under which permits are issued (to control local damages or to reach population objectives) and which depredation is in effect (aquaculture, expanded aquaculture, and/or public resource)." (FWS at 5503) "The main difference between man-

agement activities conducted under Alternatives C, D, and E would be the degree to which and by whom they are conducted." (FWS at 5538)

As explained in the Final EIS, the FWS concluded that Alternative C did not adequately remedy the effects of the growing double-crested cormorant population:

Given the current population growth parameters and overall population status of [double-crested cormorants], it is very unlikely that the increased mortality associated with this alternative would significantly impact regional or continental [double-crested cormorant] populations. This alternative would be somewhat more effective than the No Action alternative in addressing impacts. It would probably resolve some localized problems, but it would not enhance the flexibility of other agencies to manage [double-crested cormorants].

(FWS at 5539) The FWS also concluded that Alternative C would limit aquaculture predation more effectively than the then-existing system, noting that in cases where strong evidence of fishery impact existed, the agency would be likely to grant depredation permits. (FWS at 5548–49) The FWS concluded that Alternative C would prove less effective than the PRDO in limiting the double-crested cormorants' aquaculture depredation, apparently because the birds rapidly replace one another at aquaculture feeding sites. (FWS at 5573–74)

The FWS anticipated that the PRDO's broader control regime would be the one most beneficial to commercial aquaculture. (FWS at 5574) Other bird species would be served by the approach, the FWS concluded, because only trained professionals would shoot the double-crested cormorants, and the FWS would be cautious about issuing depredation permits in areas with high numbers of look-alike species.

(FWS at 5558) The FWS observed that double-crested cormorants had been responsible for property losses in 19 states, including harm to structures, trees, and shrubbery. (FWS at 5579) The FWS concluded that Alternative C would not mitigate property losses any less than the then-existing system, whereas the PRDO "would likely have the secondary impact of reducing property damage." (FWS at 5580)

The FWS ultimately concluded that "the chief direct effects" of Alternative C "would be displacement and limited take of nesting, roosting, or feeding [double-crested cormorants] or their nests or eggs and some displacement of bird species that nest, roost, or feed with [double-crested cormorants], as well as limited incidental take." (FWS at 5585) "Long term effects on [double-crested cormorant] populations are not anticipated to be significant." (FWS at 5586) The FWS also anticipated that under Alternative C, the results "could include even greater abundance of [double-crested cormorants], continued destruction of habitat, regional declines in some bird populations," and continued depredation at fisheries and hatcheries. (FWS at 5586)

Ultimately, the FWS provided the following rationale for adopting the PRDO and not Alternative C:

> The preferred alternative is preferable to Alternative C because it allows for greater flexibility in dealing with many types of resource conflicts (i.e., agencies experiencing cormorant damages could, in many cases, plan and implement management actions more readily) and we believe that it will thus reduce those conflicts more effectively.

(FWS at 5586); *see also* 68 Fed.Reg. at 58,034 ("The Increased Local Damage Control Alternative (C) was not selected because it does not provide other agencies with the flexibility needed to adequately address resource damages caused by [double-crested cormorants].") The published notice of the proposed rule also stated that the PRDO "is intended to enhance the ability of resource agencies to deal with immediate, local concerns by giving them more management flexibility." 68 Fed. Reg. at 12,654. In explaining its decision to adopt the PRDO, the Final EIS noted that "[w]e did our best to be responsive to the concerns of these entities and to enhance their management flexibility as much as we felt reasonable within the context of our responsibility to ensure the conservation of [double-crested cormorant] populations." (FWS at 5588)

The FWS articulated a satisfactory explanation for its actions, including a connection between the facts pertaining to the challenges presented by the cormorant population and the benefits of adopting the PRDO. *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856. At the conclusion of a drafting process that lasted approximately four years, the FWS decided that the PRDO was the preferable means for negating the double-crested cormorants' depredation of public resources, in part because Alternative C would not sufficiently curb the overall cormorant population (FWS at 5586), a valid consideration because of the birds' resiliency and their persistence in repopulating key feeding sites, specifically including aquaculture facilities. (FWS at 5573–74) In short, although damage caused by depredation was often highly localized, the FWS concluded that a broader solution was necessary to manage those localized effects. True, there is room for legitimate disagreement between the parties as to whether the PRDO is the optimal route for managing the double-crested cormorant population. The Court's function on review, however, is not to second-guess or substitute an agency's policy judgments.

*Overton Park,* 401 U.S. at 416, 91 S.Ct. 814.

Having undertaken a thorough review of the administrative record before me, it is clear that the FWS pursued an exhaustive inquiry, and articulated a reasoned conclusion as to the best route for controlling the cormorant population. In acknowledging certain gaps in known research concerning the double-crested cormorant, the FWS did not render its final conclusion arbitrary and capricious, but rather, indicated an intention to readjust its management strategy once the PRDO went into effect.

Thus, I reject the plaintiffs' contention that the FWS acted arbitrarily and capriciously in adopting the PRDO.

### 3. *The Order Does Not Contradict the FWS's Implementing Regulations*

 Finally, the plaintiffs argue that the FWS violated its own implementing regulation, and therefore was arbitrary and capricious in adopting the PRDO. Pursuant to a regulation set forth at 50 C.F.R. § 21.42, "[u]pon receipt of evidence clearly showing that migratory game birds have accumulated in such numbers in a particular area as to cause or about to cause serious damage to agricultural, horticultural, and fish cultural interests," the FWS director may issue a depredation order permitting the killing of such birds. The regulation, 50 C.F.R. § 21.42(a), provides that this killing shall be done only by shotgun. Plaintiffs argue that because the cormorant is classified as "a nongame, noninsectivorous bird," 68 Fed.Reg. at 58,-023, to permit its killing, including by means other than a shotgun, violates section 21.42.

This argument is without merit. The text of 50 C.F.R. § 21.42 explicitly governs the killing of *game* birds. It is not a universal regulation that prescribes the means by which all migratory birds may be killed. Because it explicitly governs game birds, protections of other migratory birds should not be read into its text. The FWS has issued other regulations that establish depredation orders of other birds, including non-game birds. *See, e.g.,* 50 C.F.R. § 21.43 (establishing procedure as to depredation orders for blackbirds, cowbirds, grackles, crows, and magpies); 50 C.F.R. § 21.44 (California counties may, without a permit, kill horned larks, crowned sparrows, and house finches). Under the plaintiffs' logic, these and similar regulations would be arbitrary and capricious or contrary to law. Because there is no basis for reading 50 C.F.R. § 21.42 into the regulation of all migratory birds, I reject this ground for granting summary judgment to the plaintiffs.

### II. *Did the FWS Violate the Endangered Species Act By Not Seeking Formal Consultation?*

 Plaintiffs argue that the FWS was arbitrary and capricious in its application of the Endangered Species Act ("ESA") by not undertaking formal consultation with the FWS's Endangered Species Division ("FWS–ESD") prior to issuing the PRDO. With a population of approximately two million birds, the double-crested cormorant is not an endangered species, and no party contends that the cormorant is protected under the ESA. (FWS at 5540)

The issue presented is whether the PRDO will have an incidental and detrimental impact on endangered species. In evaluating the PRDO for compliance with the ESA, the central question for this Court is whether a formal consultation was necessary to evaluate the PRDO's impact on endangered species. For the reasons explained below, I find that the FWS adopted the PRDO after a good faith, informal consultation with the Endangered Species Division, as set forth by federal

regulation, and deny this portion of the plaintiffs' summary judgment motion.

The ESA was signed into law in 1973, for the purpose of providing a program for the conservation of endangered and threatened species. 16 U.S.C. § 1531(b). The Supreme Court has held that the ESA reflects a Congressional intent for agencies to make the protection of endangered species their first priority when taking regulatory action. *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 185, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). "The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Id.*

The ESA requires federal agencies to consult the FWS–ESD to ensure that regulatory actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation with affected States ..." 16 U.S.C. § 1536(a)(2). This process is known as "Section 7 consultation." Under 16 U.S.C. § 1532(6), "[t]he term 'endangered species' means any species which is in danger of extinction throughout all or a significant portion of its range...."

I first describe the formal Section 7 consultation. Pursuant to a regulation issued by the FWS, 50 C.F.R. § 402.12(a), the FWS must undertake a biological assessment to determine whether ESA-protected species will likely be adversely affected by a given action. The FWS must receive a written request for a list of protected species or the critical habitat that may be in the area. 50 C.F.R. § 402.12(c). If protected species are present, the FWS

may recommend further study and ultimately may issue an assessment of how the underlying activity affects protected species. 50 C.F.R. § 402.12(d)(2), 402.12(f).

A separate regulation allows for informal consultation between the applicant and the FWS–ESD. 50 C.F.R. § 402.13. This "optional process" incorporates "all discussions, correspondence, etc." between the FWS–ESD and "the Federal agency or the designated non-Federal representative" in consideration of whether formal consultation is required. 50 C.F.R. § 402.13(a). If the action is unlikely to adversely affect a protected species, the consultation process is terminated. *Id.*

Though the PRDO was issued after an informal Section 7 consultation, communications with the FWS–ESD were extensive. The informal Section 7 process lasted for approximately two years. In a memorandum dated September 13, 2002, the chief of the FWS's Division of Consultation, Habitat Conservation Planning, Recovery and State Grants wrote to the Assistant Directors–Ecological Services seeking each region's input on any Section 7 issues raised by the proposed PRDO. (FWS at 13030) Included in this request was a copy of an Intra–Service Section 7 Biological Evaluation Form ("Evaluation Form"), which set forth the anticipated effects of adopting the PRDO. (FWS at 12989–13008) Organized by region, the Evaluation Form identified protected species and habitats that may be impacted by the PRDO. (FWS at 12991–92) Then, for each species, the Evaluation Form analyzed whether and to what extent the PRDO would affect the populations of each. (FWS at 12997–13004)

The regional directors receiving the Evaluation Forms responded, often with detailed analysis. For example, the Assistant Regional Director–Ecological Services

of Region 3 noted that it was unlikely that any of Region 3's species would be mis-identified as a double-crested cormorant and actually ·shot, but warned that management scare tactics may inadvertently cause distress to protected species.[9] (FWS at 13032) An analysis from the Assistant Regional Director of Region 6 observed that because trained conservation professionals would perform management activities, there was a low probability of direct harm or mistaken deaths to other species.[10] (FWS at 13034) This analysis also warned that other species may be disturbed by control activities in critical habitats, and recommended that prior to pursuing control activities, agencies should first determine whether protected species were in the vicinity. (FWS at 13034) A July 15, 2003 memorandum from the assistant director of FWS's Endangered Species Division ("ESD") to the assistant director of the Migratory Birds and State Programs Division summarized the results of the informal consultation:

> The discussions concluded that the piping plover (*Charadrius melodus*), interior least tern (*Sterna antillarum*), bald eagle (*Haliaeetus leucocephalus*), and wood stork (*Mycteria americana*) could potentially be adversely affected by the proposed rule. Through further discussion, conservation measures were developed to modify the proposed action in order to protect these listed species. The conservation measures are added to the final rule as described in the attached language. The inclusion of the language in the final rule satisfies our concerns about the four species and we therefore concur with your determina-

tion that the proposed action is not likely to adversely affect any species.

(FWS at 13192) This memorandum did not constitute any sort of "end run" to avoid a formal Section 7 consultation. Pursuant to regulation set forth at 50 C.F.R. § 402.13(b), during the course of informal consultation, the ESD "may suggest modifications to the action that the Federal agency ... could implement to avoid the likelihood of adverse effects to listed species or critical habitat."

The language submitted by the ESD makes clear that the PRDO does not authorize the take of any species protected by the ESA, and requires the take of any such species to be "immediately" reported. 50 C.F.R. § 21.48(d)(8). When there are anticipated adverse effects from control activities in an area where ESA protection applies to the piping plover, interior least tern, bald eagle, or wood stork, consultation must occur between the Regional Migratory Bird Permit Office and the Endangered Species Field Offices. 50 C.F.R. § 21.48(d)(8)(iii). Following consultation with the ESD, the PRDO also specified that the use of firearms to kill or harass double-crested cormorants or other harassment methods must occur more than 1,000 feet from active piping plover or interior least tern nests or colonies; more than 1,500 feet from active wood stork nesting colonies, more than 1,000 feet from active wood stork roost sites, more than 750 feet from feeding wood storks, and more than 750 feet from active bald eagle nests. 50 C.F.R. § 21.48(d)(8)(i)(A). The PRDO established distance halos for other control activities. 50 C.F.R.

---

**9.** Region 3 is comprised of the states of Minnesota, Illinois, Indiana, Ohio, Michigan, Missouri, Iowa and Wisconsin. (FWS at 13010) The PRDO applies to all of these states. (*Id.*)

**10.** Region 6 is comprised of the states of Colorado, Wyoming, Montana, Utah, Kansas, Nebraska, South Dakota and North Dakota. (FWS at 13011) Among these states, the PRDO applies only to Kansas. (*Id.*)

§ 21.48(d)(8)(i)(B). The ESD singled out piping plovers for added protection, with the requirement that control activities cannot be pursued in areas in the Great Lakes region designated as piping plover critical habitat, absent pre-approval from a regional director. 50 C.F.R. § 21.48(d)(8)(i)(C).

Plaintiffs contend that the protections established in subsection (d)(8) "are completely illusory" because they do not explicitly require entities undertaking cormorant control to determine whether and where protected species are located prior to commencing cormorant depredation activities. For support, plaintiffs cite to portions of the administrative record, which, they claim, reflect awareness by the Division of Migratory Birds that the PRDO would likely affect protected species and require formal consultation.

In an e-mail to the Cormorant Team dated May 19, 2003, Shauna Hanisch, the Team's leader, stated: "In order to reach a 'not likely to adversely affect' determination it is necessary to write some restrictions/requirements into the final rule." (FWS at 13137) To ensure that the PRDO was "not likely to affect" any protected species, the e-mail recommended "requir[ing] agencies to notify the Regional [Migratory Bird] Permit Office about site-specific actions they plan to conduct under the PRDO, then the MB program would coordinate with [Endangered Species] on a species occurrence review (the species of concern under the PRDO are bald eagle, least tern, and piping plover)." (FWS at 13137) The language of 50 C.F.R. § 21.48(d)(8)(iii) substantially matches the action suggested in the May 19 e-mail, presumably to ensure that there would be no likely adverse effect on any protected species.

Plaintiffs also cite to a memorandum summarizing arguments offered by Regions 2, 3 and 4 of the Fish and Wildlife Service, which contended that the PRDO would likely have an adverse affect on individual members of listed species, therein requiring a formal consultation under the ESA. (FWS at 13134) An additional e-mail, dated May 20, 2003, suggested 500 feet as "a 'defensible distance'" from piping plovers when undertaking double-crested cormorant control measures. (FWS at 13142) That same e-mail also questioned "how folks are going to know in advance where plover nests are," and asked whether, prior to taking control activities, people would need to contact relevant offices to locate any nests. (*Id.*)

Plaintiffs' argument construes internal discussion, observations, analysis and tentative hypotheses as statements of fact showing that the FWS believed that a formal Section 7 consultation was required. To the contrary, the portions of the record cited by plaintiffs show that, at different points in the rulemaking process, legitimate questions arose as to whether the PRDO was either (1) likely or (2) unlikely to affect protected species. The inclusion of 50 C.F.R. § 21.48(d)(8)(iii) reflects an effort by FWS to ensure that the PRDO would *not* affect protected species. The agency's internal debates as to the best means of protecting the four relevant endangered species does not constitute a recognition by the agency that endangered species are likely to be affected by the PRDO.

Moreover, as a logical matter, the protective halo surrounding the four protected bird species would require these species' locations to be identified prior to commencing control activities. Plaintiffs do not contend that this zone of protection violates the ESA, only that the PRDO should require a formal environmental assessment prior to any control activity. But in order to comply with the protections of subsection (d)(8)(iii), it is implicit

that the individuals and agencies performing control activities are obligated to acquire knowledge of whether any of the four protected species are located near the site of the control action.[11] Such a reading of the regulation does not, as the plaintiffs argue, import implied terms into the PRDO, but gives the regulation its plain and ordinary meaning.

In addition, based on the foregoing, I conclude that the defendants used the best available scientific data in concluding that the PRDO was not likely to affect any protected species. 16 U.S.C. § 1536(a)(2). *See also Fishermen's Dock Cooperative, Inc. v. Brown,* 75 F.3d 164, 172 (4th Cir. 1996) (if available data does not settle a regulatory issue, agency bases policy conclusion on known facts and probabilities); *Heartwood, Inc. v. United States Forest Service,* 380 F.3d 428, 436 (8th Cir.2004) (the ESA requires agencies to seek out and consider existing, relevant, scientific data).

Because the FWS–ESD issued a written concurrence that the PRDO was not likely to adversely affect any protected species, and because that determination was based on the agencies' understanding of the best available data, a formal Section 7 consultation was not required. *See Fund for Animals v. Thomas,* 127 F.3d 80, 84 (D.C.Cir. 1997) (two-month informal consultation between Forestry Service and FWS satisfied

Section 7 review requirement); *Sierra Club v. Bosworth,* 352 F.Supp.2d 909, 920–21 (D.Minn.2005) (no formal Section 7 consultation required when FWS–ESD's written concurrence found Forestry Service action not likely to affect population of protected Canada Lynx). Plaintiffs' motion for summary judgment for failure to comply with the ESA therefore is denied.

III. *Did the Fish and Wildlife Service and APHIS Comply with the National Environmental Policy Act?*

Passed in 1970, the National Environmental Policy Act ("NEPA") was created to encourage "enjoyable harmony between man and his environment." 42 U.S.C. § 4321. NEPA requires every proposal for every major federal action "significantly affecting the quality of the human environment" to include a detailed statement describing the project's environmental impact. 42 U.S.C. § 4332(2)(C). The Council on Environmental Quality promulgates NEPA's implementing regulations. 40 C.F.R. § 1500.3. Agencies must prepare an EIS to "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.[12] An EIS "shall be concise, clear,

**11.** To clarify the procedures for identifying the location of members of the four protected species, the FWS issued a guidance memorandum in June 2004, which specified certain procedures for notification and approval prior to commencing control activities. (Declaration of Sarah S. Normand, Ex. R) I make note of the existence of this memorandum, but do not consider it in evaluating defendants' compliance with the ESA because "a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *National*

*Audubon Society v. Hoffman,* 132 F.3d 7, 14 (2d Cir.1997).

**12.** The regulation's full text states: "The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the

and to the point, and shall be supported by evidence that agencies have made the necessary environmental analyses." 40 C.F.R. § 1500.2(b).

 "NEPA is a procedural statute that mandates a process rather than a particular result." *Stewart Park & Reserve Coalition, Inc. v. Slater,* 352 F.3d 545, 557 (2d Cir.2003). "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself' within the area of discretion of the executive as to the choice of the action to be taken." *Id.* (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). "Given the role of the EIS and the narrow scope of permissible judicial review, a court 'may not rule an EIS inadequate if the agency has made an adequate compilation of relevant information, has analyzed it reasonably, has not ignored pertinent data, and has made disclosures to the public.'" *Id.* (quoting *Sierra Club v. U.S. Army Corps of Engineers,* 701 F.2d 1011, 1029 (2d Cir.1983)).

 In reviewing whether an agency complied with NEPA while compiling an EIS, it is not the Court's job to supplant an agency's area of expertise. "The district court does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it *de novo* for the evidence received and considered by the agency which prepared the EIS." *Sierra Club v. U.S. Army Corps of Engineers,* 701 F.2d at 1030. "This is particularly true when it comes to evaluating the factual conclusions of the EIS. If

the ... EIS has set forth responsible opposing scientific views, it is not for the district court to resolve conflicting scientific opinions." *Id.* (citing *Committee for Nuclear Responsibility v. Seaborg,* 463 F.2d 783 (D.C.Cir.1971)).

Plaintiffs challenge the EIS on three grounds. First, they argue that the FWS violated NEPA by including as its objective the need to enhance flexibility of natural resources agencies; second, that the FWS inadequately considered other reasonable alternatives; and third, that the EIS did not include an adequate compilation of relevant information. I address each of these arguments in turn.

A. *The FWS's Stated Objectives and Listed Alternatives Met the Standards of NEPA.*

 The Second Circuit has held that "an agency will not be permitted to narrow the objective of its action artificially and thereby circumvent the requirement that relevant alternatives be considered." *City of New York v. U.S. Dep't of Transportation,* 715 F.2d 732, 743 (2d Cir.1983), *cert. denied,* 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984). The agency is vested with discretion to determine the range of alternatives in consideration, though it must "'consider such alternatives to the proposed action as may partially or completely meet the proposal's goal.'" *Id.* at 742 (quoting *Natural Resources Defense Council, Inc. v. Callaway,* 524 F.2d 79, 93 (2d Cir.1975)). The range of alternatives considered by the agency depends on "how narrowly or broadly one views the objective of an agency's pro-

quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has

made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions." 40 C.F.R. § 1502.1.

posed action." *Id.* at 743. In giving a "hard look" to the definition of purpose, an agency should consider the views expressed by Congress in its grant of authority to the agency. *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C.Cir.), *cert. denied,* 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991).

Plaintiffs contend that the FWS violated NEPA by including as one of its goals the need to enhance flexibility of agencies in dealing with double-crested cormorant conflicts. They argue that this flexibility—specifically, the grant of flexibility to state wildlife and natural resource agencies—contradicts the MBTA's broad national purpose. As discussed in Part I(A), plaintiffs' construction of the MBTA is based on an unduly narrow reading of the discretion granted to the Secretary of Interior and the FWS, and nothing in the MBTA's text precludes the PRDO. Additionally, the purpose of action set forth in the Final EIS was not merely limited to agency flexibility:

> The purpose of the proposed action is threefold: to reduce resource conflicts associated with [double-crested cormorants] in the contiguous United States, to enhance the flexibility of natural resource agencies in dealing with [double-crested cormorant]-related resource conflicts, and to ensure the long-term conservation of [double-crested cormorant] populations.

(FWS at 5486) Read in the context of the two other purposes set forth in the Final EIS, enhanced agency flexibility is just one component of the FWS's efforts to manage the cormorant population, not the principal or exclusive purpose of the PRDO. Because the MBTA does not prevent agency flexibility in managing a migratory bird population, I do not believe that the FWS artificially narrowed its ob-

jectives, and reject this basis for finding that NEPA was violated.

 Plaintiffs' closely related argument—that the FWS failed to consider "relevant alternatives" to the PRDO—is similarly unavailing. NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). As set forth by regulation at 40 C.F.R. § 1502.14, the presentation of alternative actions "is the heart of the environmental impact statement.... [I]t should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options for the decisionmaker and the public." The Final EIS should explore and objectively evaluate all reasonable alternatives, and "briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). The EIS should also provide sufficient detail for a reviewer to weigh the proposals' comparative merits. 40 C.F.R. § 1502.14(b). "It is absolutely essential to the NEPA process that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives, a requirement that we have characterized as 'the linchpin of the entire impact statement.'" *Callaway,* 524 F.2d at 92 (quoting *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693, 697–98 (2d Cir.1972), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978)).

In plaintiffs' view, "the only potentially *legitimate* objective" set forth in the Final EIS is the reduction of resource conflicts associated with cormorants. (Plaintiffs' Mem. at 40, emphasis in original) As an

example of the defendants' alleged failure to consider relevant alternatives, they argue that the FWS summarily rejected non-lethal management of the double-crested cormorant population—Alternative B in the Final EIS—on the ground that it would limit management flexibility. (FWS at 5548)

Plaintiffs' argument is not supported by the record. In rejecting non-lethal methods for population control, the Final EIS observed:

> Some important setbacks to this approach are that it moves birds to other areas where they are likely to continue to come into conflict with other resources, it limits management flexibility in cases where lethal control might be the most appropriate option, and it can lead to habituation in which the birds are no longer frightened by the techniques. Thus, overall, it is considered to be less effective than the No Action alternative.

(*Id.*) Ultimately, then, the FWS not only concluded that non-lethal population management would not only move the problem from one location to another (thereby spreading it over a wider geographic area), but that non-lethal control was less effective than making no changes to the then-existing management system. Taken at face value, the FWS's rejection of Alternative B was not solely due to the Agency's desire for managerial flexibility, but because the alternative was considered less effective and problematic.

Indeed, the Final EIS includes a thorough and detailed analysis of all six alternatives seriously considered by the FWS. Totaling 165 pages, the EIS includes 63 pages of analysis comparing the relative benefits and drawbacks of the six alternatives. (FWS at 5497–5505, 5536–91) The EIS evaluated how each alternative would affect the cormorant species, fish, other birds, vegetation, federally protected species, water quality, economics, hatcheries, private property and aesthetics. (FWS at 5536–5582) Next, the EIS summarized the extent to which each alternative furthered the FWS's objectives, and compared them to a no-action outcome. (FWS at 5582–91) The EIS's review of alternative plans more than adequately satisfied 42 U.S.C. § 4332(2)(E) and 50 C.F.R. §§ 1502.14(a), (b).

Plaintiffs next argue that the defendants violated NEPA by giving inadequate consideration to a plan that would issue depredation permits on a statewide basis based on specific information from a particular state regarding the need for cormorant control. After reviewing the Draft EIS, the acting director of Region 5 sent a memorandum dated September 21, 2001, which was highly critical of the proposed PRDO, arguing that "it was the consensus of the team that the proposed alternative should establish a State-wide cormorant permit, and not a depredation order." (FWS at 2871, 2875)

The adoption of a statewide permit program was, at one point in the regulatory process, the preferred option of the Cormorant Team. As described in an internal agency document outlining the terms of such an approach, the FWS stated:

> The Coordinated Statewide Management Alternative would establish regional and state population objectives. The State wildlife or agriculture agencies could acquire a statewide cormorant control permit, and would have latitude to directly conduct local control activities that fall within a general Federal framework, and also issue subpermits to landowners. In addition to controlling cormorants at the site of damage, the States could implement population reduction activities at nesting colonies or roosting sites, which would have more

widespread effects. For states that do not acquire statewide permits, individual landowners may continue to acquire depredation permits subject to these criteria. (FWS at 10734) A predecisional table dated December 31, 2001 listed the coordinated statewide management alternative as one of five approaches then under consideration. (FWS at 10811–13) Three of the five approaches—nonlethal management, no action, and the establishment of a sport hunting season—were among the six ultimately discussed in the Final EIS. Two of the approaches—statewide management and a "flyway management alternative"—were not included in the Final EIS as their own alternatives.

The defendants argue that the statewide management alternative ultimately was incorporated into Alternative E of the Final EIS, an approach based on regional population management. The FWS rejected adopting Alternative E on logistical grounds, concluding that regional coordination would be difficult to implement:

> The development of regional [double-crested cormorant] population objectives and implementation of large-scale (as opposed to local) population reduction efforts could prove an effective means of managing this species. However, the achievement of these objectives will require levels of management intensity, agency coordination, financial commitment, and research and monitoring efforts much greater than those which currently exist.

(FWS at 5542) The FWS concluded, *inter alia*, that Alternative E would limit the double-crested cormorants' direct and indirect impact on other birds, but that non-targeted species may also be disturbed. (FWS at 5558–59)

Plaintiffs argue that Alternative E, as presented, provided an insufficient basis by which the public and policymakers could weigh the merits and drawbacks of the proposed "Coordinated Statewide Management Alternative." In their view, only an explicit alternative setting forth a statewide management alternative would satisfy NEPA and relevant regulation. However, a review of the administrative record shows that during the rulemaking process, the FWS concluded that two other approaches—the regional coordination of Alternative E and the increased local damage control discussed as Alternative C—were preferable, and incorporated aspects of the Coordinated Statewide Management Alternative in its consideration of those options. In an e-mail and attachment dated June 22, 2001, Shauna Hanisch, leader of the Cormorant Team, proposed "that we eliminate the Increased Local Damage Control and [PRDO] alternatives and replace them with a special state permit ..." (FWS at 11132) The special state permit would be modeled after a goose permit adopted in 1999. (FWS at 11133) In an e-mailed response dated June 25, 2001, John Trapp, who apparently was a member of the Cormorant Team, argued that many regional coordinators favored continued consideration of the "increased damage control" alternative. (FWS at 11132) "[I]n essence, a Depredation Order could be just as restriction [sic] as a Permit, with the advantage that State agencies and their agents would have the authority to take immediate action to control situations in which, in their opinion, cormorants were causing damage to a public resource." (FWS at 11132) Trapp argued that there were no advantages to the special state permit approach. (FWS at 11132)

In *City of New York*, the Second Circuit upheld the analysis contained in a 36–page Environmental Assessment, accompanied by nine appendices. 715 F.2d at 743. The

Environmental Assessment included nine alternative approaches considered by the United States Department of Transportation for the transport of radioactive waste. *Id.* at 736–39. The Department most seriously considered two alternatives—one that involved routing the highway transportation of radioactive materials around heavily populated areas, and the second involved routing materials only via interstate highways. *Id.* at 743. The district court held in part that the Department failed to satisfy NEPA because the Environmental Assessment did not give serious consideration to requiring waste to be transported by water barge. *Id.* The Second Circuit reversed, holding that the Department did not need to consider a broader range of alternatives because, among other things, "[e]nlarging the duty to consider alternatives to this degree would make it virtually impossible for an agency to promulgate national regulations . . ." *Id.* at 744.

The administrative record makes clear that a statewide management alternative was evaluated, rejected, but, to some extent, incorporated in the drafting of Alternatives C, D, and E. I am satisfied that the Final EIS "constitutes a reasonably comprehensive selection of alternatives, made in good faith." *Monroe County Conservation Council,* 566 F.2d at 425. That certain terms of the Statewide Management Alternative evolved and were incorporated into other proposed alternatives allowed sufficient understanding of the rationale of the rejected alternative. "Undoubtedly, innumerable additional variations" of management approaches "could have been considered and analyzed." *Id.* However, the FWS and the Cormorant Team were not "obligated to consider in detail each and every conceivable variation of the alternatives stated," and needed only to set forth alternatives sufficient "to permit a reasoned choice." *Id.* (citations and quotation

marks omitted); *see also Sierra Club v. United States Army Corps of Engineers,* 772 F.2d 1043, 1054–55 (2d Cir.1985) (NEPA requires "only the furnishing of that information needed to enable those who did not have a part in the EIS compilation to understand and consider meaningfully the factors involved. . . ."); *Friends of Bitterroot, Inc. v. United States Forest Service,* 900 F.Supp. 1368, 1373 (D.Mont.1994) ("NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered or which have substantially similar consequences. As a result, an agency's consideration of alternatives is sufficient if it examines an appropriate range of alternatives, even if it does not consider every available alternative.") (internal citation omitted).

The Final EIS was more than sufficient to satisfy NEPA and its standards as articulated by the Second Circuit. As such, I reject plaintiffs' argument that the defendants violated NEPA by not publishing a separate analysis in the Final EIS discussing the Statewide Management Alternative.

B. *The Agency's Final EIS Contained an Adequate Compilation of Relevant Information.*

▇▇▇▇ Finally, the plaintiffs argue that the EIS does not contain a "reasonably adequate compilation of relevant information" as required by NEPA. As held by the Second Circuit:

If the district judge finds that the agency did not make a reasonably adequate compilation of relevant information and that the EIS sets forth statements that are materially false or inaccurate, he may properly find that the EIS does not satisfy the requirements of NEPA, in that it cannot provide the basis for an informed evaluation or a reasoned deci-

sion. Further, the court may properly be skeptical as to whether an EIS's conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise.

*Sierra Club,* 701 F.2d at 1030. The plaintiffs argue that the Final EIS violated NEPA because it contained "very little data" on which to base its consideration of alternatives.

For instance, they contend that the EIS professed that the FWS had little idea of how many cormorants would be taken pursuant to the PRDO. Even a cursory review of the relevant portion of the Final EIS shows that this argument lacks merit. The FWS provided an estimate, based on the historic data and "factor[ing] in any other special considerations. (FWS at 5540) The Final EIS set forth the FWS's method for estimating the total number of annual takes likely to occur pursuant to the PRDO:

> [F]rom 1998 to 2000 the total annual take of [double-crested cormorants] in the contiguous U.S. for depredation control purposes averaged 47,662 birds (2.4 percent of the estimated continental population of 2 million birds). This figure largely represents take at aquaculture facilities in the southern U.S. Since agencies that participate will be able to shoot [double-crested cormorants] with greater efficiency than aquaculture producers (e.g., they will have more resources to expend and will be able to focus their activities in areas in which cormorants are concentrated in greatest abundance) we increase this figure. Thus, compared to take under the aquaculture depredation order (average 2,760 birds killed annually per participating State from 1998–2000 [total estimate take under depredation order divided by

13]), we assume that 150 more [double-crested cormorants] would be killed annually in each participating State under the alternative, or about 4,140 per State. Multiplying the figure of 4,140 by 24 (the number of States where the public resource depredation order applies) amounts to an estimated annual take of 99,360 adult and juvenile [double-crested cormorants]."

(FWS at 5540) The FWS's estimated take totaled 159,635 birds per year, or 8 percent of the continental population. (FWS at 5540)

Plaintiffs have selectively excerpted portions of an e-mail sent by Cormorant Team leader Shauna Hanisch discussing what issues in the EIS merited discussion and scientific analysis. (FWS at 11188–89) Hanisch rejected analyzing certain issues because, she wrote, "I'm trying to save some time and space by not wasting effort on issues that don't add value to the analysis.... If you are seriously concerned that parts of the DEIS are insufficient and will not further the ends of NEPA (to improve decision-making), then we need to discuss those concerns so I can make the necessary changes." (FWS at 11188–89) Hanisch noted that "[a]ll of the 'best available science' is literature!", but noted that much of the evidence concerning the cormorants' environmental effects was anecdotal. (FWS at 11189)

As the Second Circuit stated in *Callaway,* however, under NEPA an agency need not delay action to wait for a completed scientific study, provided that the agency "furnish[es] some information on and analysis of the subject rather than postpone the matter for consideration." *Callaway,* 524 F.2d at 90. Unlike *Town of Huntington v. Marsh,* 859 F.2d 1134, 1143 (2d Cir.1988), the FWS did not merely defer a "hard look" assessment to a future date, but rather, based its analysis on a

considerable body of then-available knowledge, while acknowledging certain open questions that merited future research and monitoring.

I therefore reject the plaintiffs' argument that the Final EIS violates NEPA by failing to include an adequate compilation of relevant information.

*The ADO*

Plaintiffs seek declaratory and injunctive relief against the continued implementation of the Aquaculture Depredation Order, 50 C.F.R. § 21.47, the rule that permits aquaculture facilities in thirteen states to utilize firearms to take double-crested cormorants when the birds are found committing or about to commit acts of depredation on aquaculture stock. Plaintiffs' motion papers fail to address in what respects and to what extent the ADO is unlawful. Presumably, the arguments contesting the lawfulness of the PRDO are intended to incorporate the plaintiffs' contentions as to the ADO. Having provided the Court with no other basis to determine the ADO to be unlawful, the plaintiffs' motion for summary judgment is denied, and the defendants' motion is granted.

*CONCLUSION*

The defendants' motion for summary judgment is GRANTED. The plaintiffs' motion for summary judgment is DENIED. The Clerk is directed to enter judgment for defendants.

SO ORDERED.